UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| JADEN THOMAS, RYAN BRAVERMAN, KATIE DEDELOW, JAKE RAMSEY, ISABELLA BLACKFORD, MICHAEL DUKE, LINDSAY FREEMAN individuals, each on behalf of himself/herself and all others similarly situated, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 1:18-cv-03305-TWP-DML |
| THE TRUSTEES OF INDIANA UNIVERSITY, | ) ) ) | |
| Defendant. | ) | |

## ENTRY ON APPLICATION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

This matter is before the Court on an Application for Temporary Restraining Order and Preliminary Injunction ([Filing No. 23](#)) filed by Plaintiffs Jaden Thomas, Ryan Braverman, Katie Dedelow, Jake Ramsey, Isabella Blackford, Michael Duke, and Lindsay Freeman (collectively, "Plaintiffs"). Plaintiffs are freshman students at Indiana University ("IU") in Bloomington, Indiana. After discovering mold infestation in their dorm rooms at IU, Plaintiffs initiated this lawsuit on behalf of themselves and other similarly situated IU students against the Trustees of Indiana University ("Defendant" or "Trustees") to obtain declaratory and injunctive relief and to recover damages arising from the mold issue.

Plaintiffs seek a temporary restraining order directing Defendant to:

(i) refrain from making misleading, inaccurate, coercive or confusing statements to members of the putative class regarding the dangers posed by Mold or the effectiveness of remedies offered or implemented by IU and (ii) refrain from spoliation of evidence and take necessary steps to video or photograph, and also retain physical viable samples of, the mold found in IU's dorms prior to its removal during remediation.

([Filing No. 23 at 1](#).) The Court, having considered the parties' briefs and having heard oral arguments on November 19, 2018, **grants in part and denies in part** the Plaintiffs' Application for Temporary Restraining Order, and to the extent that Plaintiffs seek a preliminary injunction, **takes under advisement** that request pending a hearing, which will be held at a later date.

## I. BACKGROUND

On October 17, 2018, Plaintiffs filed a Complaint in Monroe Circuit Court, asserting claims for breach of contract, breach of implied warranty of habitability, and declaratory judgment on behalf of themselves and other similarly situated IU students ([Filing No. 1-1 at 7](#)–19). Each of the Plaintiffs is a freshman student at IU's Bloomington campus and resides in either the McNutt dormitory or the Foster dormitory. *Id.* at 7–8.

In their Complaint, Plaintiffs allege that, when they started their undergraduate experience at IU during the Fall 2018 semester, they each moved into residential dormitories operated and maintained by IU. However, their IU dorm rooms were not clean, safe, and habitable because it was soon discovered that their rooms were infested with mold. Plaintiffs allege the mold "created a dangerous and toxic environment for Plaintiffs and members of the putative Class." *Id.* at 9. They further allege that IU has had a mold problem in its residential dormitories for several years, and IU has been aware of its mold problem. *Id.*

Plaintiffs allege the Defendant has failed to adequately remediate the mold problem in its dormitories. Plaintiffs and other IU students are getting sick and suffering other adverse effects because of the mold, and their requests to adequately remediate the mold problem have gone unanswered. The mold problem has forced Plaintiffs to relocate, and this has adversely affected their studies and student life. Moreover, Defendant has failed to provide detailed and accurate information about the nature of the mold problem and IU's efforts to remediate the mold. *Id.* at 10.

In an effort to address the mold problem in the IU dormitories, Defendant has conducted an investigation of the crawl spaces and basements below the dorms and has examined them for standing water or other evidence of water intrusion ([Filing No. 30 at 6](#)). The exterior of the buildings has been analyzed, and no instances of water saturation or infiltration on the exterior skin or within the rooms was observed. *Id.* Defendant then analyzed moisture sources at the individual room level and focused on the individual fan coil units and the outdoor weather conditions. Defendant identified the students' use of the air conditioning units in the individual rooms as a likely source of moisture causing the mold. Defendant conducted a fan coil unit inspection in the dorm rooms, which included extensive cleaning by opening the fan coil unit, inspecting the pipe chases and coils, removing and replacing insulation, wiping away visible dust or accumulation with an antimicrobial agent, and HEPA vacuuming the area, window sills, and nearby areas. *Id.* at 7. Defendant also installed HEPA air purifiers in thousands of dorm rooms ([Filing No. 24-10](#)).

Where visible mold has been found in dorm rooms, Defendant has had certified industrial hygienists inspect the room and take field notes and photographs. Remediation activities have been conducted to remove the mold and clean the dorm rooms. After the remediation activities are completed in a dorm room, a spore trap sample of the air in the room is collected and analyzed by a third-party laboratory. Dr. Beauregard Middaugh ("Dr. Middaugh"), IU's Senior Industrial Hygienist and Environmental Health and Safety Systems Manager who is overseeing Defendant's remediation efforts, then analyzes the data from the spore trap samples as well as other data. Based upon his professional judgment and the review of data, Dr. Middaugh determines whether each particular dorm room can be reoccupied. If it is determined that a room can be reoccupied, the

student is informed of that determination. If it is determined that a room cannot be reoccupied, additional remediation efforts are performed ([Filing No. 30 at 8](#)–10).

More than 1,200 rooms have been cleaned or remediated in the McNutt and Foster dormitories so that they can be reoccupied. This work was completed by November 2, 2018. Approximately thirty-nine rooms are still receiving enhanced remediation, and there are twenty-four rooms that have yet to be inspected. Additionally, there are about 391 rooms in the Teter dormitory that Defendant intends to inspect if needed and to take appropriate action. *Id.* at 11.

Defendant established a website (http://buildings.iu.edu) to provide information to students, students' family members, and the public about the mold problem and remediation efforts. This website addresses many frequently asked questions and also allows students to obtain updated information about the status of their particular dorm room. The website also provides access to the detailed laboratory data for individuals interested in seeing that level of information. The website is updated daily and also provides information about a mold remediation call center that provides additional resources ([Filing No. 24-8](#); [Filing No. 24-9](#); [Filing No. 24-10](#); [Filing No. 32-15](#)).

Nine days after Plaintiffs initiated this lawsuit, on October 26, 2018, Defendant filed a notice of removal, thereby removing the lawsuit from Monroe Circuit Court to this Court ([Filing No. 1](#)). The Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), served as the basis of Defendant's removal. Soon thereafter, Plaintiffs filed their Application for Temporary Restraining Order and Preliminary Injunction on November 9, 2018 ([Filing No. 23](#)).

## II. LEGAL STANDARD

The standards that apply to preliminary injunction orders also apply to temporary restraining orders. *Loveless v. Chi. Bd. of Election Comm'rs*, 2004 U.S. Dist. LEXIS 18832, at *6

(N.D. Ill. Sep. 8, 2004). Federal Rule of Civil Procedure 65(b) provides that a temporary restraining order may be issued without notice to the adverse party only if "specific facts in an affidavit or a verified complaint *clearly show* that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition." Here, Defendant has been put on notice regarding Plaintiffs' Motion and has had an opportunity to respond in writing and provide briefing on the legal issues that are before the Court.

To obtain a temporary restraining order, the moving party has the burden of showing that "it is likely to succeed on the merits, that it is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in its favor, and that issuing an injunction is in the public interest." *Grace Schs. v. Burwell*, 801 F.3d 788, 795 (7th Cir. 2015). The greater the likelihood of success, the less harm the moving party needs to show to obtain an injunction, and vice versa. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of the United States of America, Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008). A temporary restraining order "'is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion.'" *Goodman v. Ill. Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)); *see also Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 389 (7th Cir. 1984) (granting preliminary injunctive relief is "an exercise of a very far-reaching power, never to be indulged in except in a case clearly demanding it").

### III.     DISCUSSION

Plaintiffs assert that they are likely to succeed on the merits of their claims—breach of contract, breach of implied warranty of habitability, and declaratory judgment—because Defendant:

> has already admitted that it failed to provide its students the safe and clean dorm rooms that they bargained for when agreeing to come to IU and live on its campus: "The rooms in Foster and McNutt, and some other residence halls, were not what you or we expected and that is not acceptable." (Exh. A at ¶ 25 and Exh. 7 thereto.) IU has further admitted that a large number of rooms were found to have levels of mold in them that were unsafe such that it was necessary to conduct "mass relocations" of its students, and some rooms have been remediated multiple times over the past two months and still evidence levels of mold that are "not acceptable." (D.E. # 5 at 6; D.E. # 11 generally.)

([Filing No. 24 at 2](Filing No. 24 at 2).) However, Plaintiffs explain, their request for a temporary restraining order does not focus on their claims but rather on the communications that Defendant sends to its students and the public as well as the spoliation of evidence during Defendant's remediation efforts.

Also before the Court is Defendant's "Motion to Strike Exhibits Cited in Plaintiffs' Witness and Exhibit List for the November 19, 2018 Temporary Restraining Order and Preliminary Injunction Hearing and Affidavits Filed on November 18, 2018." ([Filing No. 38](Filing No. 38).) The Court will first address the Motion to Strike Exhibits and then turn to the substantive motion.

A.      **Defendant's Motion to Strike Exhibits**

Defendant's Motion to Strike Exhibits seeks to strike from the docket a supplemental affidavit from Plaintiffs' expert, Rachel Adams, as well as affidavits from Plaintiffs' counsel that attach and authenticate evidence that was presented at the November 19, 2018 hearing. Defendant also seeks to strike generic categories of documents identified on Plaintiffs' exhibit list. Defendant's Motion to Strike Exhibits is based on the Court's Scheduling Order, which required the submission of exhibit lists no later than 3:00 p.m. on November 16, and Plaintiffs' late filing of affidavits and exhibits on November 18, 2018, the evening before the hearing. Because these affidavits and exhibits were untimely filed, and because some of the exhibits designated on

Plaintiffs' exhibit list were generic and not readily identifiable, Defendant argues that these items must be stricken.

Plaintiffs' counsel responded at the November 19 hearing that they had just recently received the communications attached to their affidavits, and the supplemental affidavit from Rachel Adams was created on November 18, 2018.

In light of the nature of an application for a temporary restraining order and the short time frame within which parties and courts operate under such circumstances, it is reasonable that new communications and evidence will be discovered and produced on short notice. At this very early stage of the litigation, when very little discovery has occurred, and in the context of a request for a temporary restraining order, the Court **DENIES** the Motion to Strike Exhibits. The Court notes that Defendant suffers no prejudice by the Court's consideration of the late-filed exhibits as will become apparent from the Court's resolution of the issues addressed below.

B.     **Defendant's Communications to Plaintiffs, Other Students, and the Public**

First, Plaintiffs argue that Defendant is making inaccurate, misleading, coercive, or confusing representations to its students and the public about the mold problem in the dormitories and the effectiveness of the remediation efforts. In the remediation work, mold air samples are collected and then sent to a third-party laboratory for testing, and the testing results in a "MoldSCORE." Plaintiffs argue that Defendant is communicating to students that a low MoldSCORE means that a dorm room is "safe" and "clean," and the student can move back into their room. Plaintiffs argue that this is inaccurate, misleading, coercive, or confusing because a MoldSCORE does not actually indicate that a room is safe and clean. Rather, a MoldSCORE only indicates whether mold spores found in a room are more likely to have originated from an indoor

7

or outdoor source. Plaintiffs point out that the MoldSCORE reports even acknowledge that the scores do not prove the absence of indoor mold growth.

Plaintiffs argue the communications are further misleading because Defendant is only sampling the air in the dorm rooms after HEPA filters have been running in the room; thus, accurate samplings of the air in the dorm rooms are not being taken and then provided to the laboratory for testing. The MoldSCORE also will not give an indication of mold growing on surfaces in the dorm rooms because it only accounts for airborne mold taken from air samples.

Pointing to various cases in support of their argument, Plaintiffs assert that the Court may restrain Defendant's communications that are abusive, misleading, inaccurate, coercive, or confusing and that would threaten the integrity of the class action process. *See Gulf Oil Co. v. Bernard*, 452 U.S. 89, 99–102 (1981) (court may limit communications between parties and potential class members, and the court's consideration should "result in a carefully drawn order that limits speech as little as possible"); *In re Sch. Asbestos Litig.*, 842 F.2d 671 (3d Cir. 1988); *Brown v. Mustang Sally's Spirits & Grill, Inc.*, 2012 U.S. Dist. LEXIS 144722 (W.D.N.Y. Oct. 5, 2012); *Piper v. RGIS Inventory Specialists, Inc.*, 2007 U.S. Dist. LEXIS 44486 (N.D. Cal. June 11, 2007); *Cox Nuclear Med. v. Gold Cup Coffee Servs.*, 214 F.R.D. 696, 697 (S.D. Ala. 2003). Plaintiffs argue that Defendant's communications about the mold problem and remediation efforts to IU students and the public are misleading and threaten the integrity of this lawsuit, and thus, the Court should restrain Defendant's communications.

Defendant responds that Plaintiffs have failed to demonstrate that the communications on IU's website are false, let alone abusive, such that they would warrant the extraordinary restraint sought by Plaintiffs in a temporary restraining order. Defendant points out that remediation efforts are ongoing, and thus, as new information is obtained, it is communicated to students and the

public via the website to keep them fully informed of the most up-to-date information. Defendant argues there is no misleading or inaccurate information being communicated. It also notes that the detailed MoldSCORE reports are posted on the website to provide students and the public access to more extensive information. There is no hiding or misrepresenting of information. Defendant further asserts that its website is updated on a daily basis to keep students and the public accurately informed.

Defendant notes that it has consistently and repeatedly explained to the students and public that MoldSCOREs are only one tool used in determining whether students may return to live in their dorm rooms. Defendant has not communicated that MoldSCOREs are the only component utilized to decide that a room is "safe" or "clean," nor has Defendant communicated that rooms are free of mold. Rather, Defendant has communicated accurate and appropriate information on its website to keep others apprised of the progress of remediation efforts. Additionally, Defendant argues, restraining communication with its students and the public is a grave threat to its First Amendment rights; the deprivation of such is not warranted in this case.

The Court is hard-pressed to find any inaccurate, misleading, coercive, confusing, or abusive communications made by Defendant to the Plaintiffs, other IU students, and the public about the mold problem and the remediation efforts in the dorm rooms. Defendant's website informs students that its indoor air testing is "part of IU's plan to test every room and common areas of Foster and McNutt." ([Filing No. 24-9 at 1](#).) This communication does not represent that MoldSCORE reports and the indoor air testing is the only testing and remediation being conducted. It informs students that this is only part of the remediation efforts. The website further informs students that a low MoldSCORE "indicates a low probability of mold spores originating inside," and "[t]he room is safe to inhabit and students may move back in." *Id.* If the score is moderate or

high, students are informed of assistance for relocation and next steps. *Id.* at 2. This communication does not represent that rooms are free of mold, and it does not mandate that students must move back into their dorm rooms if a low MoldSCORE is achieved.

Defendant's building website also informs students how Defendant is using the MoldSCORE information in the remediation process. "The full laboratory results, accompanied by the MoldReport and MoldScores, are reviewed by a Certified Industrial Hygienist (CIH) to determine the most appropriate course of action based upon the collective air sample results." *Id.*

The fact that Defendant's website clearly states that MoldSCOREs are only one component of Defendant's remediation efforts and only one factor in the full determination of whether a room can be reoccupied weighs against issuing a temporary restraining order to limit Defendant's communications. Additionally, the MoldSCORE reports—which Plaintiffs point out the reports acknowledge the score does not prove the absence of indoor mold growth—are made available to the students and the public on Defendant's website; thus, Plaintiffs and other students are able to see the disclaimers and all other information pertaining to the MoldSCOREs. This cuts against Plaintiffs' argument of misleading, incomplete, or inaccurate information being communicated, and it cuts against the issuance of a temporary restraining order.

Defendant also has communicated with its students via emails and text messages regarding the remediation progress in their dorm rooms and regarding the resources available to them for educational, housing, and personal support (*see e.g.*, Filing No. 32-2; Filing No. 32-5; Filing No. 32-7; Filing No. 32-8; Filing No. 32-9; Filing No. 35-1; Filing No. 35-4; Filing No. 35-5; Filing No. 35-6; Filing No. 35-7). However, these communications have not misrepresented information about the mold or the remediation and have not mandated that students move back into their dorm rooms.

Issuing a temporary restraining order is an extraordinary remedy, and as the Supreme Court explained, restrictions on communications between parties and potential class members should only be granted "based on a clear record and specific findings that reflect a weighing of the need for a limitation and the potential interference with the rights of the parties." *Gulf Oil*, 452 U.S. at 101. Furthermore, an order restricting a party's speech must be "carefully drawn" in a way that "limits speech as little as possible." *Id.* at 102. Based on the evidence before the Court at this very early stage of the litigation, the Court determines that Plaintiffs have failed to meet their burden to obtain a temporary restraining order limiting Defendant's free speech rights and its ability to communicate with its students. Therefore, the Court **DENIES** Plaintiffs' Application for Temporary Restraining Order as to Defendant's communications.

C.  **Spoliation of Evidence During Remediation**

Next, Plaintiffs ask the Court for a prohibition against the spoliation of evidence during Defendant's remediation efforts. They chronicle a number of communications that they sent to Defendant and Defendant's counsel, asking that any evidence relating to the mold problems and the remediation efforts be preserved and maintained. Plaintiffs requested that communications, emails, text messages, test results, reports, photographs, videos, audio recordings, mold samples, and any other evidence be preserved. They asked that Defendant send a "litigation hold" to any entity or individual assisting in the investigation and remediation efforts. Defendant generally responded to Plaintiffs' communications, explaining that Defendant was taking necessary steps to preserve records; however, Defendant failed to specifically identify its efforts to maintain or record evidence or its efforts to avoid spoliation of evidence. Plaintiffs repeatedly responded with more specific requests regarding photographing or video recording the mold in the dorm rooms as well as recording the remediation efforts and obtaining and preserving physical samples of the mold.

11

Plaintiffs contend that Defendant has replied with vague or incomplete answers to their questions about preserving evidence (*see* [Filing No. 24-1](Filing No. 24-1); [Filing No. 24-2](Filing No. 24-2); [Filing No. 24-3](Filing No. 24-3); [Filing No. 24-4](Filing No. 24-4); [Filing No. 24-5](Filing No. 24-5); [Filing No. 24-6](Filing No. 24-6)).

Plaintiffs argue that Defendant's lack of a direct and complete response to their questions about spoliation of evidence has raised a legitimate concern that evidence is not being properly preserved throughout the remediation process, and the mold in the dorm rooms is being destroyed without any sampling or recording. Plaintiffs note that Defendant controls the dorm rooms and the mold growing there, and any actions to remove the mold without preserving visual evidence of its growth via pictures or video will effectively deprive them and the Court from considering or using that evidence. Plaintiffs argue that Defendant's control of the evidence in this case gives them an opportunity to cause irreparable injury to Plaintiffs because the destruction of evidence of the mold in the dorm rooms will effectively deny Plaintiffs their day in court. The nature and scope of the mold problem directly impacts the Plaintiffs' opportunity to seek remedies, and thus, physical evidence of the mold is necessary to this case. Plaintiffs assert that requiring the preservation of this evidence would not burden Defendant.

Defendant responds that it has been and will continue to preserve all records related to the mold situation. This includes inspection field notes and photographs that have been taken of the mold. Defendant asserts that all this evidence will be produced to Plaintiffs in due course throughout the normal discovery process. It points out that its discovery responses to Plaintiffs' requests are not yet due. Furthermore, Plaintiffs will be able to obtain additional evidence and detailed information through depositions and other discovery means; therefore, Plaintiffs have suffered no harm. Defendant also asserts that Plaintiffs have never requested the opportunity to observe the remediation work while it is being performed.

Defendant also argue that Plaintiffs are not actually asking that evidence be preserved and not destroyed, but rather, Plaintiffs are demanding that Defendant create new and additional evidence, which is not required by law. For example, Plaintiffs want it to conduct tape lift samples of the mold during the remediation work to obtain physical samples of the mold. Defendant argues the tape lifts would create new evidence, and in any event, such evidence would not be relevant to Plaintiffs' claims. Physical samples of the mold might inform the parties of the genus and species of the mold.

Defendants challenge the efficacy and probative value of tape lifts and argue that even Plaintiff's expert, Rachel Adams, does not include tape lifts in her remediation protocol. Defendant also argues, the genus and species of the mold will not help prove or disprove the claims for breach of contract or breach of the implied warranty of habitability, and there is no basis to grant injunctive relief regarding the spoliation of evidence.

Plaintiffs do not object to the destruction of the mold in the dorm rooms during the remediation process as long as evidence of that mold is preserved. They assert,

> Photographs and tape lifts are required to mitigate the prejudice IU is causing by destroying evidence. Plaintiffs have proposed that IU take photographs and tape lifts of the dormitories before and after remediation, or allow a third-party to do so at Plaintiffs' expense. IU has refused Plaintiffs' proposals. Moreover, it has not offered Plaintiffs' any opportunity for inspection before IU's destruction of evidence. IU must be required to preserve evidence of mold and room conditions through photographs of each room and tape lift samples.

([Filing No. 32 at 7](#).) During the November 19, 2018 hearing, Plaintiffs' counsel again represented that it would cover the expense of an expert taking tape lift samples of the mold during the remediation process.

The Court acknowledges that Defendant's deadline to respond to Plaintiffs' discovery requests has not yet expired. However, the Court also notes that, based on the record before it,

13

Defendant has not been freely responsive to direct questions about the preservation of evidence. This might be the result of counsel trying to obtain from their client significant amounts of existing information as well as new information as it is being generated. Defendant's discovery responses—which are due *next week* according to Defendant's representation to the Court—may well assuage many of Plaintiffs' evidentiary concerns. Yet, Defendant also has represented that it intends to perform much remediation work in the dorm rooms *this week* during the Thanksgiving holiday school break while students are out of their dorm rooms. This period of remediation work will undoubtedly destroy and remove significant amounts of mold from IU's dormitories.

The mold itself and the remediation work being undertaken are the evidence that Plaintiffs seek to preserve. They are not asking Defendant to create new evidence. They are simply asking that the existing mold and ongoing remediation work somehow be recorded and preserved for use in this litigation whether that be through photographic evidence, video evidence, or physical samples of the mold.

The Court determines that the preservation of evidence is an essential component to the fundamental fairness that must be afforded to litigants in pursuing their claims and in determining even the viability of those claims. Without adequate preservation of evidence, Plaintiffs' ability to pursue their remedies will be substantially and unfairly impaired, causing irreparable injury. A temporary restraining order concerning obtaining and preserving evidence in the context of this case is especially appropriate in light of Plaintiffs' offer to fund at their own expense an expert who will collect physical samples and photographs of the mold. The Court notes that Plaintiffs' offer to take photographs and samples of the mold and remediation work should not be construed as an invitation to Defendant to discontinue its current practice of photographing and sampling the mold and its remediation work.

The Court **GRANTS** Plaintiffs' Application for Temporary Restraining Order as to the spoliation of evidence during the remediation process as follows. Defendant is **TEMPORARILY RESTRAINED** from allowing spoliation of evidence of the mold at its dorms to occur or to be affected by any of Defendant's employees, contractors, or agents, including specifically but not limited to by manner of removing or remediating mold from affected dorm rooms without first documenting the condition of that mold adequately and completely via photographs and/or video recording. In addition, the parties are to confer regarding the methodology of allowing Plaintiffs' supplied expert to take and preserve samples of mold to allow additional analysis to determine the genus/species of mold in the various dorm rooms. In light of Defendant's representation that it intends to remediate dorm rooms during the Thanksgiving holiday school break, Plaintiffs must immediately arrange for their selected expert to be present to take any desired samples of mold so as not to delay any scheduled remediation work.

Finally, Defendant has further requested that Defendant be ordered to preserve and not destroy or alter any documents or evidence, including but not limited to text messages, emails, electronic or paper documents or files, letters, contracts, voicemails, or other documents, relating to communications to the issues set forth in the Complaint. This request is **denied** because there is no evidence before the Court that Defendant has engaged in this type of inappropriate behavior, and such conduct is already prohibited by several rules.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion to Strike ([Filing No. 38](Filing No. 38)) is **DENIED**. Plaintiffs' Application for Temporary Restraining Order and Preliminary Injunction ([Filing No. 23](Filing No. 23)) is **GRANTED IN PART AND DENIED IN PART**. The Application for Temporary Restraining Order is **DENIED** as to Defendant's communications with its students and the public.

The Application for Temporary Restraining Order is **GRANTED** as to the spoliation of evidence as set forth above. Plaintiffs' request for a preliminary injunction remains **UNDER ADVISEMENT**.

Plaintiffs' counsel has requested that Plaintiffs be relieved of any bond. Until the Court can consider the appropriateness of a bond more fully, that request is **granted**. This Temporary Restraining Order applies to Defendant Trustees of Indiana University and its officers, agents, servants, employees, attorneys, and other persons who are in active concert and participation with any of these individuals or entities. This Temporary Restraining Order shall remain in effect for **fourteen (14) days** after the date of issuance or until a ruling on the Plaintiffs' motion for preliminary injunction, whichever is earlier, or until any earlier additional order of the Court, or until a later date if Defendant consents to a longer extension.

The parties are **ordered** to promptly contact the Magistrate Judge to schedule a conference to finalize an expedited discovery plan and briefing schedule and pursue resolution of any other remaining issues. A hearing on Plaintiffs' request for a preliminary injunction will be set following the parties' conference with the Magistrate Judge.

**SO ORDERED.**

Date of Issuance: November 21, 2018

_____
TANYA WALTON PRATT, JUDGE
United States District Court
Southern District of Indiana

Time of Issuance: 2:00 p.m.

Distribution:

Scott R. Alexander
TAFT STETTINIUS & HOLLISTER LLP
salexander@taftlaw.com

Thomas A. Barnard
TAFT STETTINIUS & HOLLISTER LLP
tbarnard@taftlaw.com

Jacob R. Cox
COX LAW OFFICE
jcox@coxlaw.com

Frank J. Deveau
TAFT STETTINIUS & HOLLISTER LLP
fdeveau@taftlaw.com

Ann O. McCready
TAFT STETTINIUS & HOLLISTER LLP
amccready@taftlaw.com

Jonathon Noyes
WILSON KEHOE & WININGHAM
JNoyes@wkw.com

William E. Winingham
WILSON KEHOE & WININGHAM
winingham@wkw.com